IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| ELIZABETH VICTORIA LAFFITTE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:20CV163 |
| | ) | |
| ANDREW SAUL, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Elizabeth Victoria Laffitte ("Plaintiff") brought this action pursuant to

Sections 205(g) and 1631(c)(3) of the Social Security Act (the "Act"), as amended (42 U.S.C.

§§ 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of

Social Security denying her claims for Disability Insurance Benefits ("DIB") and Supplemental

Security Income ("SSI") under, respectively, Titles II and XVI of the Act.  The parties have

filed cross-motions for judgment, and the administrative record has been certified to the Court

for review.

I.    PROCEDURAL HISTORY

Plaintiff protectively filed applications for DIB and SSI on September 28, 2016 and

January 25, 2018, respectively, alleging a disability onset date of August 6, 2016 in both

applications.  (Tr. at 1010, 2082-85.)[1]  Her applications were denied initially (Tr. at 1962-72,

---

[1] Transcript citations refer to the Sealed Administrative Record [Doc. #10, #11, #12].

1983-86) and upon reconsideration (Tr. at 1973-82, 1992-99). Thereafter, Plaintiff requested

an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 2000-

06.) On November 9, 2018, Plaintiff, along with her attorney, attended the subsequent video

hearing, during which an impartial vocational expert testified. (Tr. at 1010.) The ALJ

ultimately concluded that Plaintiff was not disabled within the meaning of the Act (Tr. at 1026-

27), and, on January 11, 2020, the Appeals Council denied Plaintiff's request for review of the

decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes

of judicial review (Tr. at 1-7).

## II.    LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of

social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the

scope of [the] review of [such an administrative] decision . . . is extremely limited." Frady v.

Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo."

Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must

uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported

by substantial evidence and were reached through application of the correct legal standard."

Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal brackets omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992)

(quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere

scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270

F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is

evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that in administrative proceedings, "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[2]

---

[2] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

Case 1:20-cv-00163-LCB-JEP   Document 22   Filed 02/22/21   Page 3 of 21

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first two steps, and establishes at step three that the impairment "equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations," then "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual function[al] capacity ('RFC')." Id. at 179.[3] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can

---

[3] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that pursuant to the administrative regulations, the "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be

4

"perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the Commissioner to prove that a significant number of jobs exist which the claimant could perform, despite [the claimant's] impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III.    DISCUSSION

    In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" since August 6, 2016, the alleged onset date. Plaintiff therefore met her burden at step one of the sequential evaluation process. At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments:

> obesity; lumbar degenerative disc disease with spondylosis and radiculopathy; cervical degenerative disc disease with stenosis and radiculopathy; degenerative scoliosis; left knee degeneration; and bilateral hip degeneration[.]

---

determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

5

(Tr. at 1013.)  The ALJ found at step three that none of these impairments, individually or in combination, met or equaled a disability listing.  (Tr. at 1016-17.)  Therefore, the ALJ assessed Plaintiff's RFC and determined that:

> [Plaintiff] has the residual functional capacity to perform light work, as defined in 20 CFR 404.1567(b) and 416.967(b), except that [she] can frequently operate hand controls, push, pull, reach, handle, finger, and feel with both upper extremities.  She also can occasionally push or pull or operate foot controls with both lower extremities.  [Plaintiff] can occasionally kneel, crouch, stoop, balance, and crawl, and can occasionally climb ramps and stairs.  She can never climb ladders, ropes and scaffolds, and can never be exposed to unprotected heights, and moving mechanical parts.  [Plaintiff] can have occasional exposure to dust, mists, gases, noxious odors, fumes, pulmonary irritants, and poor ventilation.  [She] can tolerate occasional exposure to vibration.  [Plaintiff] requires a cane to ambulate.  She is able to understand, carry out, and remember simple instructions, and make simple work related decisions.  She also will be off task ten percent of the workday.

(Tr. at 1017.)  Based on this determination and the testimony of a vocational expert, the ALJ determined at step four of the analysis that Plaintiff could not return to any of her past relevant work.  (Tr. at 1024-25.)  However, the ALJ found at step five that, given Plaintiff's age, education, work experience, RFC, and the testimony of the vocational expert as to these factors, she could perform other jobs available in significant numbers in the national economy.  (Tr. at 1025-26.)  Therefore, the ALJ concluded that Plaintiff was not disabled under the Act.  (Tr. at 1026-27.)

Plaintiff now challenges the ALJ's RFC assessment on multiple fronts.  Specifically, Plaintiff argues that the ALJ (1) failed to properly evaluate her subjective complaints in accordance with 20 C.F.R. 404.1529 and Social Security Ruling ("SSR") 16-3p, (2) mischaracterized or improperly discounted evidence of her standing and walking difficulties in finding her capable of light work, and (3) failed to properly explain how Plaintiff's obesity

6

affected her RFC. After a thorough review of the record, the Court finds that Plaintiff's first and second contentions merit remand. Because the ALJ's failure to properly consider all of the relevant evidence impacts the ALJ's evaluation of Plaintiff's subjective complaints, the Court addresses these arguments in reverse order.

A.     Walking and standing limitations

As indicated at both step two of the sequential analysis and in testimony, Plaintiff's back impairments, including "lumbar degenerative disc disease with spondylosis and radiculopathy; cervical degenerative disc disease with stenosis and radiculopathy; [and] degenerative scoliosis," comprised the bulk of not only her impairments, but her related, alleged limitations, including standing and walking restrictions. Plaintiff now alleges that the ALJ failed to mention, let alone discuss, significant evidence relating to her back conditions, and improperly discounted opinion evidence regarding her physical limitations.

The ALJ's discussion of the objective evidence supporting Plaintiff's claims, including MRIs, other imaging, and clinical evidence, consists of a single paragraph:

> Magnetic resonance imaging in 2011 . . . revealed degenerative changes along [Plaintiff's] cervical spine, including spurring. (1F/1.) Imaging in June 2017 identified degenerative changes in both [Plaintiff's] lumbar spine (20F/53), and cervical spine (20F/46), including disc height loss (20F/53), and degenerative osteophytes (20F/46). X-rays in October 2017 further revealed "mild tricompartmental" degenerative changes (20F/198), and x-rays have divulged "mild bilateral hip" degenerative process (3F/21). Finally, imaging has also revealed scoliosis in [Plaintiff's] lumbar spine. (9F/1.) Providers have treated [Plaintiff's] symptoms surgically; for instance, sources have completed a cervical discectomy (5F/109). [Plaintiff's] symptoms, however, have remained substantially unchanged over the period in issue. On clinical examination, sources have objectively observed [Plaintiff] ambulating with an abnormal gait (40F/2), and exhibiting decreased sensation (39F/81). Providers have also observed spinal tenderness. (34F/7.)

(Tr. at 1018-19.)

7

While this summary briefly mentions Plaintiff's 2016 cervical fusion, it entirely omits Plaintiff's two more recent spinal surgeries, both of which occurred during the time period at issue. Specifically, the evidence reflects that on August 24, 2016, shortly after her alleged disability onset date, Plaintiff underwent cervical fusion surgery. Soon after that surgery, Plaintiff's claims were reviewed by a state agency physician, Dr. Clayton, who noted that he would "[e]xpect routine healing following neck surgery," so that "within 12 mo[nths] of 8/16, [she] would be capable of RFC as written." (Tr. at 1979). However, after the administrative denial of her claim, Plaintiff experienced further degeneration in her lumbar spine, and underwent lumbar surgery on August 23, 2017, with placement of bilateral pedicle screws at L2, L3, L4, L5, and S1; bilateral L4-L5 and L5-S1 facetectomies; L4-L5 and L5-S1 laminectomies; placement of intervertebral mechanical spacer slush device at L4-L5 and L5-S1; and posterior lateral arthrodesis from L2-S1. (Tr. at 2783.) She went home, but fell 10 days later when trying to stand up from bed, and was admitted to the hospital on September 3, 2017, and underwent another lumbar surgery. (Tr. 2798, 2801, 2810.) She was discharged on September 12, 2017, to a residential rehabilitation facility, where she stayed until September 26, 2017. (Tr. at 3894-4014.) During October and November 2017, she received rehabilitation services at her home (Tr. 2559-2631), and then qualified for 60 hours per week of in-home care through Medicaid, which continued through the date of the hearing in November 2018. During the period from November 2017 through the hearing in November 2018, she underwent several additional procedures to try to control her pain, including placement of a permanent spinal cord stimulator. (Tr. at 3009-10, 2913-15, 3061-73.) As noted above, the

8

ALJ's decision briefly mentions Plaintiff's August 2016 cervical fusion surgery, but failed to mention either of her lumbar surgeries or subsequent procedures in 2017 and 2018.

The decision also fails to mention any of the imaging after Plaintiff's August 2017 surgery, particularly Plaintiff's September 2017 MRI of her lumbar spine and CT of her lumbar spine, which objectively describes the state of Plaintiff's back impairment after her August 2017 surgery. (Tr. at 2816-18.) In pertinent part, the MRI in question revealed the following abnormal findings:

- T10-T11: Broad-based disc bulge with a super-imposed disc herniation, ligamentum flavum thickening, and bilateral facet hypertrophy. "These changes result in moderate canal and lateral recess stenosis as well as left greater than right foraminal stenosis, similar to prior."

- T11-T12: "Broad-based disc bulge and ligamentum flavum thickening as well as facet joint hypertrophy resulting in mild canal and left greater than right foraminal stenosis, similar to prior."

- L2-L3: "Broad-based disc bulge, ligamentum flavum thickening and facet hypertrophy resulting in mild left foraminal narrowing."

- L3-L4: "Disc dessication with a broad-based disc bulge, ligamenta flavum thickening and facet hypertrophy resulting in severe canal and right foraminal stenosis. There is also moderate left foraminal stenosis."

- L4-L5: "Status post dorsal decompression with improved canal stenosis, now mild. Residual bilateral foraminal narrowing following facetectomy, although evaluation is limited by hardware."

9

- L5-S1: "Interval dorsal decompression with placement of an interbody spacer. Abnormal tissue in the left lateral canal causing mass effect on the left thecal sac (series 5, image 30), likely reflecting granulation tissue and/or developing scar. This likely causes mass effect on the descending S1 nerve root. There are degenerative facet changes bilaterally resulting in mild left foraminal stenosis. Evaluation limited by hardware."

(Tr. at 2816.) The impression reflects that even following surgery, there was "persistence of severe canal and right greater than left foraminal stenosis at L3-L4" and "[l]ikely granulation tissue and/or developing scar at the level of L5-S1, which causes mass effect on the left lateral canal and may impinge the descending S1 nerve root." (Tr. at 2816.) The impression on the CT scan notes "[m]ultilevel mild to moderately severe spondylosis contributing to multilevel mild-to-moderate neural foraminal stenosis, acquired spinal canal stenosis at L3-L4 and mild to moderately severe effacement of subarticular recesses greatest at L3-L4 on the right otherwise detailed above." (Tr. at 2818.)

Despite the extensive and largely abnormal findings set out in Plaintiff's September 2017 MRI ant CT results, Defendant argues that the ALJ's omission of the most recent imaging evidence was inconsequential, as an ALJ "need not discuss every piece of evidence in making an RFC determination." (Def.'s Br. [Doc. #21] at 13) (citing Reid v. Comm'r of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014)). Nevertheless, an ALJ may not selectively quote the record, omitting evidence favorable to Plaintiff. Lewis v. Berryhill, 858 F.3d 858, 869 (4th Cir. 2017). In the present case, it appears that the ALJ did just that.

Case 1:20-cv-00163-LCB-JEP   Document 22   Filed 02/22/21   Page 10 of 21

In addition, throughout his RFC analysis, the ALJ repeatedly discounted the opinion evidence, testimony, and abnormal test results based solely on treatment records noting normal gait, sensation, and strength. (See Tr. at 1018-1024.) In doing so, the ALJ mischaracterized or completely ignored evidence of greater limitations, and discounted all of the opinions of Plaintiff's treating physicians and third party assessments. For example, Plaintiff underwent a North Carolina Division of Medical Assistance assessment in her home in October 2017 with regard to her need for in-home healthcare services, which reflects as follows:

> Observed beneficiary transfer in/out of shower on/off the shower chair by holding onto the back of the chair with one hand and her rollator with the other hand but requires supervision due to impaired balance, pain and limited ROM in her lumbar and cervical spine due to recent back surgery. She demonstrated washing her face, front upper body to her waist; she is unable to reach below her waist due to back pain and limited ROM and requires assistance with washing her legs, feet and back. . . . [She] requires assistance with shampooing hair due to impaired endurance and back pain. . . . She was unable to complete the task of donning/removing pants on/off over her feet due to difficulty bending from back pain and limited ROM in her cervical and lumbar spine due to recent back surgery but she was able to pull her pants up/down around her waist from her thigh level. She requires assistance with donning/removing socks, shoes and assisting with foot brace on her left ankle as she is unable to bend at the waist. . . . Observed beneficiary transfer on/off chair/bed by balling up her fists and pushing herself off of the furniture and then grabbing the arms of her rollator but requires supervision to prevent injury due to impaired balance, pain and limited ROM in her back. She is able to turn and position herself in bed and she ambulated around her home using her rollator with a slow, steady gait. . . . . She was able to demonstrate the use of her microwave and can make small meals for herself such as making a sandwich or a bowl of cereal with set up of supplies but she was unable to prepare larger meals due to impaired balance, pain and limited ROM in her back causing her pain while standing or sitting for long periods of time.

(Tr. at 2965.) A follow-up evaluation in January 2018 is similar. (Tr. at 2931-2947.) The ALJ gave these evaluations "no weight" because "[t]hese documents do not indicate that this

11

provider applied Social Security's rules, regulations, or standards in making these assessments"
and the form "does not evidence consideration of the claimant's whole medical evidence of
record." (Tr. at 1021). The ALJ also cited treatment records noting normal sensation, and
strength. (See Tr. at 1021.) The aide who ultimately provided in-home services to Plaintiff,
Ms. Campbell, provided a report in September 2018, noting that she spent 2 hours a day with
Plaintiff in Plaintiff's home, every day for 10 months (61 hours per month), with the following
observations:

> I am present on a daily basis when she takes her first round of medication,
> bathes, and dresses. She uses a transfer bench in the shower on which she can
> sit and slide into the shower without having to step over the side. While she is
> bathing, I am doing light housekeeping (wash dishes, dust, sweep, mop, take the
> garbage out, organize her meals for the day, make her bed, straighten her room,
> make things she may need accessible for her). After her bath, I comb her hair.
> She has made changes to her wardrobe to accommodate her limitations so that
> she can dress herself on most days, but if she requires assistance in dressing on
> any particular day, then I help her dress. After she is dressed, she performs her
> stretching exercises. At the end of my shift, we walk up and down the length of
> her driveway for about 15 minutes. Twice per week, I wash, fold, and put away
> clothes; make prepared meals that are stored in plastic containers so that they
> can be warmed in the microwave. Once per week, I render basic foot and nail
> care to her, and I assist her with washing her hair. I organize the dosages of her
> medications for each week. I check the bathroom daily, and I clean the
> bathroom thoroughly each week.

> Ms. Laffitte requires my services because of her limitations in twisting, bending,
> stooping, crouching, walking, sitting, reaching, lifting, pushing, and pulling. I
> see on a daily basis how her limitations affect her life in her performance of all
> of her activities of daily living. She has to take breaks to lie down after engaging
> in most activities because of exacerbations of her level of pain. She is visibly
> uncomfortable standing for any length of time because of the instability and
> weakness of her left leg, and she rarely sits for longer than 15-30 before she is
> repositioning herself or standing up. She has to eat her meals in her bed while
> she is lying on her left side because of the pain that she experiences while sitting
> at a table. She also experiences pain, tremors, and muscle cramps in her right
> hand making it hard to do many things that would require fine motor skills.
> Many times, her pain makes her lose concentration and focus on what she may

be doing at the time. When that happens, she will leave it to go lie down to ease the pain.

. . . Her medical conditions and the limitations they have imposed upon her have prevented her from functioning both physically and mentally to the degree that she once functioned. She has already come a long way, but she still has a long way to go in adjusting to her limitations.

(Tr. at 2183-84.) The ALJ gave this statement "significant weight" as to the "nature of [Plaintiff's] limitations" but "little weight" otherwise because it was "based substantially on [Ms. Campbell's] own subjective observations of [Plaintiff] rather than objective medical data." The ALJ also cited to treatment records noting normal range of motion. (See Tr. at 1023.)

The ALJ similarly gave limited weight to the opinions of Nurse Tabitha Hollins and Plaintiff's treating physician Dr. Abigail Smith. In an opinion letter in September 2018, Nurse Hollins said:

[Plaintiff] has a history of chronic neck pain and cervical spondylotic myeloradiculopathy for which she underwent a C4-C6 anterior cervical discectomy and fusion on 8/24/16. She recovered well from this surgery. She had some chronic remaining myelopathy symptoms from prior to surgery which included hypoesthesia right hand laterally and weakness right grip. She also has a history of levo convex scoliotic curvature with mechanical instability and radiculopathy lower extremity. She underwent a L2-S1 posterior lumbar interbody fusion with hardware on 08/23/2017, she also recovered well from this surgery. Unfortunately she had a fall and developed recurrent left leg pain and a new left leg weakness in the setting of stenosis thus she underwent L3-4 decompression on 9/7/17. She continues to have significant pain/paresthesia's left leg unfortunately regardless of the surgery after the fall thus we referred her to pain management for evaluation and treatment options as there is no surgical option.

(Tr. at 4018). Plaintiff's treating physician, Dr. Smith, also provided an opinion letter in September 2018, noting that Plaintiff had "lumbar spinal stenosis, cervical spinal stenosis" with limited range of motion, muscle atrophy in her left leg with a 1 inch circumferential difference, inability to walk on heels, inability to walk on toes, inability to arise from a squatting

13

position, and "weakness and decreased sensation of left leg." (Tr. at 4019.) Dr. Smith noted

that her opinion was based on Plaintiff's MRI and physical examination. Dr. Smith's treatment

record for September 27, 2018, the same day as the opinion, sets out Plaintiff's prior CT and

MRI results, and reflects that on physical examination Plaintiff was positive for back pain,

joint pain, myalgias, dizziness, tingling, tremors, and focal weakness. She had reduced strength

on her left side (4/5 in left arm, 3/5 in left leg), was unable to squat unassisted, unable to toe

or heel walk on left foot, had decreased sensation to light touch in her left leg, and had muscle

atrophy with "decreased circumference in L thigh compared to R thigh." (Tr. at 4095-4102.)

The ALJ gave the opinions of Nurse Hollins and Dr. Smith "limited weight", citing other

treatment records reflecting a "normal gait." (Tr. at 1022, 1023.) In rejecting Dr. Smith's

treating physician opinion, the ALJ also said that Dr. Smith's opinion "contained few citations

or references to other objective medical evidence" and did not indicate that Dr. Smith had

"considered all of [Plaintiff's] whole objective medical documentation." (Tr. at 1023.)

This rejection of Dr. Smith's treating physician opinion is contrary to recent guidance

from the Court of Appeals for the Fourth Circuit. For claims like Plaintiff's that are filed

before March 27, 2017, ALJs evaluate the medical opinion evidence in accordance with 20

C.F.R. § 404.1527(c). Brown v. Comm'r Soc. Sec., 873 F.3d 251, 255 (4th Cir. 2017). "Medical

opinions" are "statements from acceptable medical sources that reflect judgments about the

nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis,

what you can still do despite impairment(s), and your physical or mental restrictions." Id.

(citing 20 C.F.R. § 404.1527(a)(1)). While the regulations mandate that the ALJ evaluate each

medical opinion presented to her, generally "more weight is given 'to the medical opinion of

a source who has examined you than to the medical opinion of a medical source who has not examined you.'" Brown, 873 F.3d at 255 (quoting 20 C.F.R. § 404.1527(c)(1)). And, under what is commonly referred to as the "treating physician rule," the ALJ generally accords the greatest weight—controlling weight—to the well-supported opinion of a treating source as to the nature and severity of a claimant's impairment, based on the ability of treating sources to

> provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) [which] may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(c)(2). However, if a treating source's opinion is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" or is "inconsistent with other substantial evidence in [the] case record," it is not entitled to controlling weight. 20 C.F.R. § 404.1527(c)(2); see also Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *4; Brown, 873 F.3d at 256; Craig, 76 F.3d at 590; Mastro, 270 F.3d at 178.[4] Instead, the opinion must be evaluated and weighed using all of the factors provided in 20 C.F.R. § 404.1527(c)(2)-(c)(6), including (1) the length of the treatment relationship, (2) the frequency of examination, (3) the nature and extent of the treatment relationship, (4) the supportability of the opinion, (5) the consistency of the opinion with the record, (6) whether the source is a specialist, and (7) any other factors that may support or contradict the opinion.

---

[4] For claims filed after March 27, 2017, the regulations have been amended and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. The new regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. § 404.1520c. However, the claim in the present case was filed before March 27, 2017, and the Court has therefore analyzed Plaintiff's claims pursuant to the treating physician rule set out above.

The Fourth Circuit has recently confirmed the application of the treating physician rule in Arakas v. Commissioner, 983 F.3d 83 (4th Cir. 2020) and Dowling v. Commissioner, 986 F.3d 377 (4th Cir. 2021). In Arakas, the Fourth Circuit "emphasized that the treating physician rule is a robust one: '[T]he opinion of a claimant's treating physician [must] be given great weight and may be disregarded only if there is persuasive contradictory evidence.'" Arakas, 983 F.3d at 107 (quoting Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987)). Thus, "the opinion *must* be given controlling weight *unless* it is based on medically unacceptable clinical or laboratory diagnostic techniques or is *contradicted* by the other substantial evidence in the record." Id. (emphasis in original). Similarly, in Dowling, the Fourth Circuit emphasized that even if a "medical opinion was not entitled to controlling weight, it does not follow that the ALJ had free reign to attach whatever weight to that opinion that he deemed fit. The ALJ was required to consider each of the six 20 C.F.R. § 404.1527(c) factors before casting [treating physician] opinion aside." Dowling, 986 F.3d at 385. "While an ALJ is not required to set forth a detailed factor-by-factor analysis in order to discount a medical opinion from a treating physician, it must nonetheless be apparent from the ALJ's decision that he meaningfully considered each of the factors before deciding how much weight to give the opinion." Id.

Here, the ALJ did not analyze the relevant factors and summarily dismissed the opinion evidence, including the treating physician opinion of Dr. Smith. As noted above, the ALJ repeatedly discounted the opinion evidence based solely on treatment records noting normal gait, sensation, and strength. (See Tr. at 1018-1024.) However, the treatment records do not provide a basis for discounting the opinion evidence, nor do they support the ALJ's ultimate RFC determination. For example, the ALJ repeatedly cites (at least seven times) the same

treatment records for the proposition that Plaintiff had a "normal gait" and was "ambulating normally." (Tr. at 1014, 1016, 1017, 1019, 1020, 1022, 1023). In support of this repeated assertion, the ALJ cites the same seven treatment notes. (Tr. at 1014, 1016, 1017, 1019, 1020, 1022, 1023 (citing Tr. at 3547, 2320, 2672, 2428, 3022, 3161, 4034.)) However, two of those treatment records are for unrelated visits prior to the alleged onset date. (Tr. at 3547 (June 29, 2013), Tr. at 2320 (April 28, 2016). In addition, two of the treatment records are duplicate citations to the same visit. (Tr. at 3022, 3161.) Thus, there are only four treatment records cited for the period after the August 2016 alleged onset date. The first treatment record is for an April 10, 2017 visit to Nurse Navey at the Neurology Clinic, and reflects that Plaintiff's "routine gait is normal" but also that she is a "Fall Risk" and was "instructed to ask for assistance with ambulation" and was being seen for left arm weakness and advanced cervical scoliosis. (Tr. at 2670-73.) The second treatment record is for a June 14, 2017 physical therapy visit that includes the notation "Gait: Normal" but also reflects a functional limitation of "walking over 15 minutes," motor deficits in her left and right hips, a positive straight leg raise, major movement loss, and a problem list of "Decreased strength, Difficulty with prolonged standing, Impaired [activities of daily living], Impaired ambulation, Difficulty with prolonged sitting." (Tr. at 2427-30.) The third treatment record is for a November 9, 2017 visit to the pain clinic a few weeks after her release from the hospital and rehabilitation facility following her two lumbar surgeries. That treatment note does include a notation of "Normal Gait" but also notes a positive straight leg raise, a history of recent spinal fusion surgery, ongoing pain, a plan to schedule a left L5 and S1 nerve block, and a discussion of a possible spinal cord stimulator implantation. (Tr. at 3156-63, 3022-23.) Finally, the fourth treatment note is a

17

September 4, 2018 visit to the pain clinic that similarly includes a notation of "Normal Gait" but also reflects a positive straight leg raise on the left, use of a mobility device, identification as a fall risk, and a problem list reflecting impaired functional mobility (Tr. at 4034, 4040, 4046.) These records do not support the ALJ's repeated citation of them for the proposition that Plaintiff could ambulate normally. Ultimately, the ALJ's reliance on mischaracterized and cherry-picked "normal" exam findings to summarily dismiss virtually all of the opinion evidence as "inconsistent" with the record renders the decision unsupported. The ALJ's incomplete and cursory review of Plaintiff's imaging and failure to even mention her two lumbar surgeries further compounds this problem. Further, Plaintiff's documented need for both a home health care aide and a rolling walker and/or cane after her surgeries also strongly contradicts the ALJ's findings, particularly that Plaintiff's symptoms (1) were largely unchanged during her alleged disability period and (2) allowed her to walk and stand for up to 6 hours in an 8-hour workday.[5] Because the ALJ failed to properly consider the above evidence in formulating Plaintiff's RFC, including her ability to stand and walk, substantial evidence fails to support the ALJ's decision.

B.     Subjective complaints

The failure to consider all of the relevant objective evidence was not the only error committed by the ALJ. The ALJ also failed to properly weigh Plaintiff's subjective complaints when determining her disability status. Throughout his decision, the ALJ cited the lack of significant physical abnormalities upon exam as the basis for discrediting the limitations

---

[5] The Plaintiff's use of significant assistance between her surgeries in August and September of 2017 and her hearing in November 2018 also suggest that Plaintiff may have qualified for disability from the time of her surgeries forward, a possibility the ALJ did not consider. To the extent the evidence supports such a possibility, it should be addressed on remand.

reported by both Plaintiff and her providers, including physicians, nurses, and home health care providers. (See, e.g., Tr. at 1018-24.) In doing so, however, the ALJ failed to consider Plaintiff's abnormal MRI results and CT results, failed to even mention her two lumbar surgeries, and failed to consider subsequent interventions including nerve blocks and implantation of a spinal cord stimulator, as discussed at length above. The ALJ essentially omitted the bulk of the objective evidence and then asserted that Plaintiff's claims were not supported by objective evidence. This error likewise renders the decision unsupported by substantial evidence. Moreover, the ALJ also ignored the potential impact of both pain and intermittent symptoms on Plaintiff's functional abilities. See also Arakas, 983 F.3d at 95-96 ("Here, the ALJ disregarded this longstanding precedent and the agency's own policy by improperly discounting Arakas's subjective complaints of pain and fatigue, based largely on the lack of objective medical evidence substantiating her statements. . . . Because Arakas was entitled to rely exclusively on subjective evidence to prove that her symptoms were so continuous and/or so severe that [they] prevent[ed] [her] from working a full eight hour day, the ALJ applied an incorrect legal standard in discrediting her complaints based on the lack of objective evidence corroborating them." (internal quotations omitted)).

In the present case, as discussed above, Plaintiff suffered from numerous back impairments, including "lumbar degenerative disc disease with spondylosis and radiculopathy; cervical degenerative disc disease with stenosis and radiculopathy; [and] degenerative scoliosis." (Tr. at 1013.) Plaintiff further testified that these well-documented and longstanding impairments caused the vast majority of her symptoms and limitations. (Tr. at 1018, 1931-38, 1940-45.) The ALJ summarized this testimony as follows:

> [Plaintiff] allege[d] that conditions including cervical radiculopathy, chronic pain syndrome, and upper extremity weakness prohibit h[er] from working. (3E.) As a result of these conditions, [Plaintiff] report[ed] that she finds a substantial range of activities to be extremely difficult. (8E.) For example, [Plaintiff] testified that her conditions impair her ability to lift and walk. She testified, e.g., that she is not able to lift a gallon of milk. [Plaintiff] testified that [she] can lift half a gallon of milk, but can carry it no further than ten feet. [She] has also reported that she requires an aide to assist her in completing activities of daily living. (2D.) At hearing, when asked how long she can stand in one place, [Plaintiff] responded that sitting and standing always cause her pain.

(Tr. at 1018.) Despite the ALJ's assertions elsewhere in the decision that his dismissal of Plaintiff's statements was based on "objective medical and other evidence" (see, e.g., Tr. at 1018, 1024), the evidence cited by the ALJ in support of his symptom evaluation consists entirely of treatment records that the ALJ selectively cites as purportedly reflecting normal ambulation, strength, sensation, coordination, and range of motion as evidence that Plaintiff's symptoms were less severe than she alleged. (Tr. at 1019-20.) In making this determination, the ALJ not only mischaracterized the records and ignored a plethora of contrary evidence throughout the nearly 4000 pages of medical evidence, as discussed in greater detail above, he also omitted the objective evidence that did support her claims, as noted above, and "improperly increased [Plaintiff's] burden of proof by effectively requiring her subjective descriptions of her symptoms to be supported by objective medical evidence" in the first place. Arakas, 983 F.3d at 95-96 (quotation omitted). This error clearly presents an additional and independent basis for remand. In light of the recommended remand, the Court need not reach the final issue presented by Plaintiff.

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be REVERSED, and that the matter be REMANDED to the Commissioner under sentence four of 42 U.S.C. § 405(g). The Commissioner should be directed to remand

the matter to the ALJ for proceedings consistent with this Recommendation. To this extent, Defendant's Motion for Judgment on the Pleadings [Doc. #20] should be DENIED, and Plaintiff's Motion for Judgment on the Pleadings [Doc. #14] should be GRANTED. However, to the extent that Plaintiff's motion seeks an immediate award of benefits, it should be DENIED.

This, the 22nd day of February, 2021.

_____/s/ Joi Elizabeth Peake_____
United States Magistrate Judge